**Wendell L. SHAFFER and Marjorie M. Shaffer, Appellants,**

v.

**Robert C. WILSON, Special Agent of the Internal Revenue Service, et al., Appellees.**

**No. 74–1671.**

United States Court of Appeals, Tenth Circuit.

May 23, 1975.

Rehearing Denied Sept. 8, 1975.

Leslie H. Wald and Dale W. Haines, Denver, Colo., for appellants.

Scott·P. Crampton, Asst. Atty. Gen., Washington, D. C., Gilbert E. Andrews, Robert E. Lindsay, and Daniel F. Ross, Tax Div., Dept. of Justice, Washington, D. C., James L. Treece, U. S. Atty., Denver, Colo., of counsel, for appellees.

Before SETH, McWILLIAMS and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Dr. Wendell L. and Marjorie M. Shaffer (Shaffers) appeal from an adverse

summary judgment order [1] entered in favor of several special agents of the Internal Revenue Service and the United States.[2]

Dr. Shaffer is a dentist residing in Colorado Springs, Colorado, where he has practiced alone since 1960. His wife, Marjorie, is his receptionist. On Friday, October 22, 1971, at approximately 8:00 A.M. appellees served a search warrant on Dr. Shaffer. The warrant authorized the search of his office for fiscal and business records relating to his income and expenses. After serving the warrant, the appellee agents searched his office and seized numerous records and documents.

On May 24, 1973, Shaffers filed an action under Rule 41(e), Fed.R.Crim.P.[3] and 28 U.S.C.A. § 1331 seeking return of their property; suppression of any evidence obtained; injunctive relief; and damages. After granting Shaffers a preliminary injunction on July 5, 1973, the Trial Court, following motions for Summary Judgment filed by both parties, did, upon reviewing the briefs and affidavits, enter summary judgment for appellees.

The Court found that the search and seizure was proper; that there was no "compulsion" here in the Fifth Amendment sense; that the Fourth Amendment requirements for obtaining a warrant were complied with in all respects so as to protect Shaffers' rights; that the articles seized were business records and not private papers; that the business records were records of which others must have knowledge; and that since the search was proper, Shaffers were not entitled to damages.

On appeal, Shaffer contends that: (1) the seizure of the private papers of a dentist practising as a sole practitioner violated his privilege against self-incrimination; and (2) the search and seizure was unreasonable under the Fourth Amendment.

## I.

Shaffers contend that the seizure of a dentist's private papers under a search warrant is violative of his Fifth Amendment privilege against compulsory self-incrimination. In support thereof, they rely on Hill v. Philpott, 445 F.2d 144 (7th Cir. 1971), cert. denied 404 U.S. 991, 92 S.Ct. 533, 30 L.Ed.2d 542 (1971), and Vonder Ahe v. Howland, 508 F.2d 364 (9th Cir. 1974).

In *Hill* the Court held that personal books and records of suspected tax evaders cannot be obtained by search warrant because of the Fifth Amendment prohibition against compulsory self-incrimination under circumstances whereby such books and records could have been refused under the Fifth Amendment privilege if they had been sought by subpoena or summons. The Court did not, however, distinguish between the "compulsion" aspect presented via a subpoena or summons, if such there be, and the lack of same under a search warrant.

In *Vonder Ahe*, the Court, in citing to *Hill*, held that there was no probable cause under a general search warrant for the indiscriminate seizure of all of a dentist's books, records, personal and private papers. We readily agree that a general search warrant does not afford "carte blanche" to seize *all* records, personal and business. However, in *Vonder*

1. Reported below at 383 F.Supp. 554 (D.Colo. 1974).

2. Hereinafter collectively referred to as "appellees".

3. Rule 41(e) provides in part:

   (e) Motion for Return of Property and to Suppress Evidence. A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of the property and to suppress for the use as evidence anything so obtained on the ground that (1) the property was illegally seized without warrant, or (2) the warrant is insufficient on its face, or (3) the property seized is not that described in the warrant, or (4) there was not probable cause for believing the existence of the grounds on which the warrant was issued, or (5) the warrant was illegally executed.

*Ahe*, the Court declined to determine whether the documents seized should be suppressed on Fifth Amendment grounds, inasmuch as there were no civil or criminal proceedings then pending against the plaintiff.

The Trial Court held that neither *Hill* nor *Vonder Ahe* controlled the case at bar. We agree. In declining to follow the rationale of *Hill* and *Vonder Ahe*, the Trial Court found:

> . . . it appears that there was no compulsion in the Fifth Amendment sense, attendant to the search and seizure in this case.

We hold that the Trial Court properly found that "compulsion" (re appellants' Fifth Amendment constitutional rights) was not present here. Significantly, the search warrant was properly executed. Accordingly, appellants' due process rights were fully protected. This holding is consistent with those of other circuits.

In United States v. Bennett, 409 F.2d 888 (2nd Cir. 1969), cert. denied, Haywood v. United States, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969), a search incident to defendant's arrest produced a letter which incriminated him. The Court held that the letter could be seized in order to determine whether it was an instrumentality for effecting a conspiracy and that the Fourth Amendment right to be free from unreasonable search does not protect against seizure of things whose compulsory production would be forbidden by the Fifth Amendment. This rule was reiterated in United States v. Scharfman, 448 F.2d 1352 (2nd Cir. 1971), cert. denied 405 U.S. 919, 92 S.Ct. 944, 30 L.Ed.2d 789 (1972), wherein the Court further noted that the seizure of index cards and a consignment memorandum book was constitutionally valid, even though the search warrant failed to describe them. The Court reasoned that it was entirely reasonable to assume that the materials were used as instrumentalities in connection with the crime of disposing of stolen fur garments.

In United States v. Blank, 459 F.2d 383 (6th Cir. 1972), cert. denied 409 U.S. 887, 93 S.Ct. 111, 34 L.Ed.2d 143 (1972), the Court held that worksheets of a sports and horsebetting business seized under an admittedly valid search warrant could not be suppressed, regardless of whether they might be in the defendant's handwriting, since they were not personal communications but rather business accounts of which other persons must have knowledge. The Court observed that the documents were "extraordinary" only because the business itself was illegal. In recognizing the lack of "compulsion" relative to a search warrant, the Court further noted:

> . . . there is a valid and important distinction between records sought by subpoena and records sought by search warrant. The subpoena compels the person receiving it by his own response to identify the documents delivered as the ones described in the subpoena. The warrant involved no such element of compulsion upon an actual or potential defendant.

459 F.2d at 385.

*Blank* was followed in United States v. Gargotto, 476 F.2d 1009 (6th Cir. 1973). The Court there held that lawfully seized documents were not subject to suppression in a prosecution for a false wagering excise tax return as violative of one's Fifth Amendment privilege against self-incrimination.

In Taylor v. State of Minnesota, 466 F.2d 1119 (8th Cir. 1972), cert. denied 410 U.S. 956, 93 S.Ct. 1425, 35 L.Ed.2d 689 (1973), the Court denied the defendant's claim that the seizure of an incriminating memorandum [4] was violative of his Fifth Amendment rights. The Court held that the search in question was "sufficiently specific" so as "not to amount to a general search" and that

---

4. The memorandum in question instructed the defendant's wife on how to prepare and condition a young woman for service as a member of their stable of prostitutes.

the evidence failed to establish that the memorandum was obtained by coercion.

In United States v. Murray, 492 F.2d 178 (9th Cir. 1973), cert. denied 419 U.S. 942, 95 S.Ct. 210, 42 L.Ed.2d 166, the Court, in a decision rendered some two years prior to its *Vonder Ahe* holding, ruled that the seizure of an address book pursuant to a search incident to an arrest did not violate the defendant's Fifth Amendment privilege.

■ We accordingly hold that under the facts reflected in the record of this case, and in view of the substantial supportive legal authority, that the seizure of the records herein, pursuant to a valid search warrant, was not violative of Shaffers' Fifth Amendment privilege against self-incrimination. The materials seized were business records of which other persons must have knowledge. United States v. Blank, *supra.*

■ There is no violation of one's Fifth Amendment privilege against self-incrimination by reason of the proper execution of a valid search and seizure. Nor would the privilege be violated upon the execution of a valid search and seizure incident to a lawful arrest predicated on probable cause. Information properly obtained in a non-accusatorial setting does not violate one's Fifth Amendment privilege. Pauldino v. United States, 500 F.2d 1369 (10th Cir. 1974). To hold contrariwise, extending Shaffers' contentions to their extreme, would surely mean that police officers could not seize a gun or other instrumentality of a crime pursuant to a properly issued and validly executed search warrant. If such a rule prevailed, one of the most effective tools in the enforcement of the

criminal justice system would be shackled.[5]

## II.

Shaffers contend that the search and seizure was unreasonable under the Fourth Amendment because: the warrant was overly broad in scope; the warrant tells the officers to seize too much; and because the agents went beyond the warrant and seized items not set forth therein, including non-fiscal personal and clinical records. We hold that this contention is without merit. The Trial Court properly found that:

> Moreover, the articles seized by defendants were business records rather than private papers which are "so much a part of personhood that they ought to enjoy a superlative privacy." Hill v. Philpott, 445 F.2d at 150 (dissenting opinion of Judge Fairchild). The affidavits appended to Defendant Wilson's application for a search warrant reveal that at least Plaintiff's employees and former employees had knowledge of these records. Thus, the items seized were not private, but rather "business records of which other persons must have knowledge."

■ The Fourth Amendment prohibits only an unreasonable search undertaken without a warrant. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); United States v. Nevarez-Alcantar, 495 F.2d 678 (10th Cir. 1974), cert. denied 419 U.S. 878, 95 S.Ct. 141, 42 L.Ed.2d 117. The mandates of the Fourth Amendment are complied with when there exists a reasonable nexus between the item to be seized and the criminal behavior alleged. Warden v.

---

**5.** In so holding we also observe the continued efficacy of Donaldson v. United States, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971), wherein the Court held:

> "We hold that under § 7602 an internal revenue summons may be issued in aid of an investigation if it is issued in good faith and prior to a recommendation for criminal prosecution."

400 U.S. 517 at 536, 91 S.Ct. 534, at 545, 27 L.Ed.2d 580.

See also United States v. Bisceglia, 420 U.S. 141, 95 S.Ct. 915, 43 L.Ed.2d 88 (Decided February 19, 1975); United States v. Continental Bank & Trust Company, 503 F.2d 45 (10th Cir. 1974); United States v. Hodgson, 492 F.2d 1175 (10th Cir. 1974).

Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

The search warrant herein was not unreasonable under the Fourth Amendment because of overbreadth. The warrant provided, inter alia:

. . . there is now being concealed certain property, namely fiscal records relating to the income and expenses of Dr. Wendell L. Shaffer from his dental practice and other sources from January 1, 1966 to December 31, 1970, including, but not limited to, dental patient cards, appointment books, cash receipt books, cash disbursement books, expense records, business ledgers, log books, bank ledger sheets and statements, deposit tickets, cancelled checks, purchase invoices, copies of receipts covering payment of fees, copies of invoices and bills . . ., an approximately 5½" by 7",—paper pad— allegedly known as a "cheat book", . . . .

The warrant, properly issued and limited in scope to business records as related, *supra*, was predicated largely upon the supporting affidavits of three of Dr. Shaffer's previous employees. These affidavits established unequivocally that: Dr. Shaffer kept a log and a "cheat book"; Dr. Shaffer did not record all of his receipts in his log book; items were recorded in the "cheat book" and not in the log; Dr. Shaffer continually bragged to patients and employees about how he cheated on his income tax returns; Dr. Shaffer wrote checks for services never performed and then took "kickbacks"; and that Dr. Shaffer told an employee to "pad" his supply account expenses.

There was sufficient probable cause to issue the warrant, and the warrant was specific in relation to the items to be seized. We hold that the warrant, as issued and as executed, was not violative of Shaffers' Fourth Amendment rights.

Affirmed.

SETH, Circuit Judge (dissenting):

The record shows that appellants knew that an examination of their income tax returns was under way, but, of course, no charges had been filed nor other steps short thereof had been taken by the Internal Revenue Service. The warrant for the search and seizure was based on affidavits by former employees. The facts therein contained have not been proved or disproved at this point. In this proceeding the warrants and affidavits are accepted at face value for the limited purpose of testing the validity of the search.

The search warrant in its operative portion, after a listing of all possible financial and patient records, books, and accounts, states: " * * * and diverse other records of financial transactions."

The warrant was executed by some six or eight agents appearing at the dental office of appellant, Wendell L. Shaffer, where he practiced by himself, at or shortly before he opened it for the day. This group of agents remained there for about seven hours going through all the records in the office, emptying the file cabinets, desk drawers, and closets. The papers seized were placed by the agents in some eighteen boxes and hauled away. The dentist had appointments for the day but could not continue. Clinical records, patient x-rays, and correspondence were removed. The brief of the Government states that: "The special agents attempted to segregate and seize only documents described in the warrant." Some patient records were copied during the course of the search so that the dentist could, as the Government says, " . . . carry on his practice." The originals of the documents seized have been returned to the appellants, but the IRS has retained copies. The appellants thus seek return of the copies, suppression of the information seized, and damages. The trial court granted the motion of the IRS for summary judgment.

This case apparently represents a practice of the IRS developed following the decision in Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782. The legality of the device is apparently being litigated and has been litigated by the

IRS in a number of Circuits with varying results.

With the decline of the "mere evidence" rule as a consequence of its being consumed by the exceptions made possible to a large extent by Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231, and by the infinitely expandable category of "instrumentalities," there was really not much left by the time *Warden* was decided except the formality. The rule as a doctrine had been destroyed, but the full extent of the consequences of its demise are now being explored. The severity of the impact of the change as far as recorded history of the IRS is concerned is described quite vividly in Hill v. Philpott, 455 F.2d 144 (7th Cir.); United States v. Bennett, 409 F.2d 888 (2d Cir.); United States v. Blank, 459 F.2d 383 (6th Cir.), and in Vonder Ahe v. Howland, 508 F.2d 364 (9th Cir.). The description of the warrants used in the searches and seizures considered in these opinions brings into focus some of the background material or historical "blurbs" currently being provided by the Bicentennial authorities.

In Warden v. Hayden, the Court stated that there was no Fifth Amendment problem. There eyewitnesses to a robbery followed the defendant to a point where he entered a house; within minutes the police arrived, entered the house, found the defendant, and found in a washing machine the clothing the robber was described as wearing. The clothing was the matter in issue. The Court in the *Warden* opinion traces the rise and fall of the "mere evidence rule," and makes very clear a shift away from attention to "property" and directed the consideration to "privacy." This importance of "privacy" is a pointed reiteration of such a factor mentioned in other opinions on related issues. This is an important element of the opinion generally, and as it relates to our problem. Furthermore the opinion in *Warden* indicates that some things by their very nature may be precluded from search and seizure under a warrant. Thus there are some "things" which can always be reached by a search warrant and some other "things" which can never be reached; this all apparently under the Fourth Amendment. The *Warden* opinion also mentions another important concept in its reference to "nexus."

To consider the last mentioned element in *Warden*, that is the "nexus" requirement or doctrine, it must be noted under the facts of *Warden*, with the hot pursuit, the officers were obviously looking for a described person, the weapons used in the robbery (or others which might endanger the officers), the clothing worn by the robber, and the loot, but not necessarily in that order or any other order. Thus the "nexus" problem was, as far as the clothing was concerned, a clear one and one easily resolved on the ground by the officers making the search. The connection of the clothing with the defendant and with the crime, and the nature of the crime was direct. In the case before us, the "nexus" problem arises in the need expressed by the description in the warrant of the items to be searched for, and again in the execution of the warrant by the seizure. The six or eight agents making the seizure could not be in a position, as were the officers in *Warden*, to make a decision on the connection between the items seized and the crime, and this was supposed to have been done for them by the description in the warrant, but it was not, and probably could not have been done. In the tax case, apparently envisioned by the IRS here, *all* records of the taxpayer would have to be examined in detail by experts in making a decision as to what would be useful in proving a case, together with other outside information as required, and the many other complicated factors and judgment going into the preparation of the case. At the time of seizure no one really knew what would be useful short of "everything," thus the general warrant and the general seizure.

The Government in its brief acknowledges the fact that the needs were unknown when it states:

"Without complete knowledge of the exact type of records which were maintained, and without particular knowledge of all the records which might reveal the alleged tax evasion scheme, no more specification than that provided here was possible."

Thus the Government says that because it did not know what might be found, it was necessary to include virtually everything with the concluding phrase in the warrant, " . . . and diverse other records of financial transactions." This obviously put the problem to the searching agents to resolve as best they could the "nexus" problem since it was not solved by the official who secured the warrant. It is perfectly obvious that no one could do so at the time because the search was in the hopes of finding something useful as a basis for preparing a case. A general warrant was thus thought necessary. A writ of assistance would have served as well. The time consumed by the agents in making the search is of some significance on this point. When we consider the fact that six or eight agents spent seven hours in the office of a single practitioner, it is apparent that the *search* portion of the execution of the warrant was a monumental undertaking. The nexus problem had been passed to them and they were doing their best to solve it on the ground because again no one really knew what was needed nor what they would find, as the Government itself indicates. A *search* under these circumstances has to be unreasonable. For all practical purposes the scope of both the search and of the seizure had to be determined on the ground by the agents making the search to try to meet the nexus standard and to attempt to make a case. This situation cannot be in conformity with the Fourth Amendment. This is more than a defect or complaint as to the wording of the warrant; it is a basic fault in the post-*Warden* method. It is not a search for evidence, but a search for a case.

With such a group of agents spending the amount of time they did in the office examining records, it would be expected that all necessary information would have been obtained by the search itself, which obviously included everything in the office, personal, secret, or whatever, and a *seizure* would be superfluous. But in any event, some eighteen boxes of material were taken away. The record shows that the agents did spend some time making copies of records for the doctor's use. This is an obvious problem with the records of a legitimate business sought to be seized by the IRS. The taxpayer is suspected of using the proceeds from the business but not filing correct returns. The crime is not the business itself or the way it is being conducted, but a secondary act by the taxpayer as to his returns plus a manipulation of the records. All of which suggests that IRS search warrants should be placed in a separate category. The search here was unreasonable under the Fourth Amendment.

The "secondary position" is a significant factor alone, and is also important under the "nexus" requirement of *Warden*. This cannot be the "mere evidence rule" in another guise by reason of the place and time of its birth.

The Court in *Warden* did not particularize as to what "privacy" referred to. It is most often used in opinions to refer to the nature of the contents of a paper or writing. It is not as frequently used to refer to an area or with a geographical connotation, and sometimes without specifying, as the Court in Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930, in considering the Fourth Amendment said:

"The basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials."

The Fourth Amendment appears to be not so concerned with things in its reference to being secure in their homes and effects, and not to what may be revealed in the papers or found in the homes.

The courts, apparently by reason of the way in which the issues reach them,

seem to be preoccupied with the "things" seized. The process is to sort these "things" by application of four or five key terms or definitions. Thus the records and things seized are examined, usually at a hearing, are evaluated by their contents, their form and origin, and thereby sorted as properly or improperly seized. There must be many things seized and returned without a recorded contest, and also by an examination by the officers and voluntary return; these do not appear in the digest system. But those that do, with the sorting process completed, we cannot help but wonder where the "privacy" is after such a process. It is a process to find an answer, but the process destroys the reason for seeking an answer.

There must be a "privacy" which surrounds the *search* itself. The Fourth Amendment contemplates some protection from a *search* as an important right. This is just as much a matter of privacy as the document-sorting procedure seeks to protect and perhaps more important. It is useful to again here refer to the magnitude and detail of the search here conducted. Also reference must be made to the *search* in Hill v. Philpott, 445 F.2d 144 (7th Cir.), and in Vonder Ahe v. Howland, 508 F.2d 364 (9th Cir.). In *Vonder Ahe* the home of the doctor was searched completely as were the personal effects of the wife, her purse, and the purse of a woman visiting her. It is the search—the entry which is the invasion of personal rights. The forcible entry by strangers is what impinges on: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

Again if a reference can be made to the Bicentennial, the *invasion* of the home and places of business was a basic problem if we can believe the TV reenactments of the historical events. Furthermore, the privacy and protection of papers and records under the Fourth Amendment had to contemplate papers and books with which employees worked, and in which they made entries. The Amendment does not refer to "secret" matters; "personal" does not mean "secret." Employee participation was just as much a way of life then as it is now, and does not make papers less personal than in substance they may be. The Fourth Amendment cannot refer alone to "personal diaries," which is often the only "personal" example provided in many opinions. Bellis v. United States, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 does not make such a distinction.

There are two parts to the Fourth Amendment as its construction and drafting history show. With items precluded under *Warden*, and with the references in Couch v. United States, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548, there can be an unreasonable search under a warrant properly issued and properly executed. These decisions serve to point up again the two segments, the two very different subjects of the two phrases. Additionally, the unreasonable execution of a valid warrant to make the search unreasonable is another aspect of the same division. The Fourth Amendment cannot be fully complied with in every instance by the issuance of a warrant proper in form and thereafter properly executed. *Warden* so indicates.

Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, has had a difficult time through the years; it has been placed on "waivers," but it is alive and fairly well, and by all appearances it is making a comeback as to some of its basic elements. It has been referred to, distinguished, and quoted from in several recent opinions of the Court, and treated at some length as recently as Bellis v. United States, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678. It is important now in its statement of a very practical conclusion. The Court there stated after reference to the much quoted "intimate relationship" between the Fourth and Fifth Amendments:

"And we have been unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially

different from compelling him to be a witness against himself."

With the arrival of the defendant's records at his trial in the hands of the prosecuting attorney, and their offer into evidence before the jury, it can make little difference at that point as to how they got into the Government's possession. They are defendant's records, and it is either stated where they were found or from whose hands they came. It makes no difference which, and it makes no difference whatever how they got to the court house. The impact is the same, and they are attributed to the defendant no matter how they were secured. It is tempting to follow the nice distinctions erected in comparisons of production by subpoena and production by a search warrant. These distinctions are very logical, and if the established terminology is followed, the answer automatically appears. However, the categories are clear, are neat and tidy, but they have all the appearances of a typical distinction without a difference. The realities of the situation must lead to an elimination of the great disparity in treatment of the "things" based on such a tenuous or nonexistent difference. The Fourth and the Fifth Amendments are each of such great significance that the protection afforded by one should not so easily be eliminated by what is no more than a matter of semantics. The "compulsion" distinction is the principal one referred to above as it fits so well into the theoretical differences. The difference between a prospective defendant standing at the door watching the agents haul out eighteen cartons of records (there he is "passive" because the warrant says he must be), as compared to a response to a subpoena where he hauls the eighteen cartons out the door himself. The "compulsion" is equally present in both cases. In one case the "defendant" interprets the words in the subpoena; in the other the agent interprets the words in the warrant. This should not lead to the great difference in constitutional protection which the Government urges here and

the majority adopts. The whole structure is built on this distinction. The whole argument of the Government is so based.

We considered some basic concepts in *Warden* in Pinelli v. United States, 403 F.2d 998 (10th Cir.), but did not have occasion to touch on the issues here present.

In this dissent I must agree with the majority in Hill v. Philpott, 445 F.2d 144, of the Seventh Circuit, and with Vonder Ahe v. Howland, 508 F.2d 364, of the Ninth Circuit, both of which are in point. The issues are much the same as are the circumstances of the searches. These are the only two direct and clear authorities on the issue. I would hold that the search was unreasonable under the Fourth Amendment considered above, and was unreasonable through the violation of the Fifth Amendment.

In the opinion in United States v. Blank, 459 F.2d 383 (6th Cir.), where a warrant issued for bookmaking materials, the court sought a middle ground which is not to me attainable. The court in United States v. Bennett, 409 F.2d 888 (2d Cir.), considered a search incident to an arrest for conspiracy to distribute narcotics. The opinion is based on an assumption that there can be no things which by their very nature are precluded from search and seizure. This to me is contrary to *Warden*. The court also bases its conclusion in part on the distinction between "compulsory" production and a search discussed above, and the "mere evidence" distinction.

The majority opinion in the case at bar in stating: "There is no violation of one's Fifth Amendment privilege against self-incrimination by reason of the proper execution of a valid search and seizure," takes an extreme position that there can be no connection between the Fourth and the Fifth Amendments. With this, I cannot agree. Nor can I agree with the statement in the majority opinion that: "The Fourth Amendment prohibits only an unreasonable search undertaken without a warrant," citing Terry v. Ohio. To me the "intimate re-

lationship" between the Fourth and the Fifth Amendments described in *Boyd* still exists. Into this relationship between the separate considerations in each there is inserted by any number of recent opinions of the Supreme Court the "right of privacy." It appears better to say that this concept is in the "relationship" because it has not been placed firmly in any particular part of the Constitution. The Fourth Amendment has its own statement of privacy which has been considered above, and this is both as to things and as to a zone or area, which, as a place, obviously cannot be taken literally. But in any event, the "privacy" is there and it certainly bears on the *search* here conducted. The opinion of the court in Hill v. Philpott, 445 F.2d 144 (7th Cir.), as to the relationship between the amendments and the testimonial-compulsion is very persuasive and sound.

I would reverse.