**UNITED STATES of America,
Appellant,**

v.

**Maurice ABRAMS, Defendant-Appellee.**

**No. 79–1073.**

United States Court of Appeals,
First Circuit.

Argued June 8, 1979.

Decided Jan. 22, 1980.

Paul F. Healy, Jr., Asst. U. S. Atty., Deputy Chief, Crim. Div., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellant.

Albert F. Cullen, Jr., Boston, Mass., with whom Marshall F. Newman, Newman & Newman, P. C., and Cullen & Wall, Boston, Mass., were on brief, for defendant-appellee.

Before COFFIN, Chief Judge, CAMP-BELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

The issue before us is the validity of a search warrant. The government has appealed a suppression order of the United States District Court, pursuant to 18 U.S.C. § 3731.[1] The court found the warrant invalid on two grounds:

(1) that the magistrate was not given an opportunity to exercise his discretion on passing on the warrant because the affidavit failed to state that the information on which it was based was, for the most part, four or five years old; and

(2) that the form of the warrant called for a general exploratory search.[2]

Since we affirm on the basis that the warrant violated the fourth amendment requirement that the things to be seized must be particularly described, our focus is on that aspect of the case.

The Department of Health, Education and Welfare (HEW) received information from former employees of defendant-appellee, Dr. Abrams, and his associate, Dr. London, that in 1972 and 1973 Medicare bills had been submitted for laboratory tests not actually done. Further information was received in September of 1976 indicating that Dr. Peter Braun, who shared office space with Abrams and London, had submitted a false claim for Medicare payments of laboratory tests or that his name was used on such claim.

HEW commenced an active investigation of the matter in March of 1976. The investigation was referred to the United States Attorney's office in October of 1976 with the recommendation that the records of Abrams and London be subpoenaed. A warrant was obtained and executed on April 20, 1977.[3] The warrant, after describing the location of the doctors' offices, states:

[T]here is now being concealed certain property, namely evidence of a crime, to wit, certain business and billing and medical records of patients of Doctors Abrams, London, Braun, and Abrams, London and Associates, Inc. which show actual medical services performed and fraudulent services claimed to have been performed in a scheme to defraud the United States and to submit false medicare and medicaid claims for payments to the United States or its agents; in violation of Title 18, United States Code, Section 1001[.]

In executing the warrant, all of the Medicare and Medicaid records in the doctors' offices were seized. In addition, approximately twenty medical records of non-Medicare-Medicaid patients were seized. The search and seizure started at 2:40 P.M. and was terminated at 5:57 P.M. on the same day.

1. 18 U.S.C. § 3731 provides in relevant part:
   An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

2. "THE COURT: A more important consideration, however, is that the form of the warrant called for a general search and was not limited in any manner which permitted the executing officer to pick those records which were properly subject to the warrant by objective crite-

ria. The warrant called for the officers to make a legal distinction between fraudulent records and records that were not fraudulent, which they were not qualified to do. The officers took that to mean they should bring back all of the medicare records, and, in fact, did so. The search, as authorized by the warrant and in fact carried out, was a general exploratory search and, therefore, invalid under the Fourth Amendment."

3. On April 15, 1977, F.B.I. agents went to a building that they mistakenly thought contained the doctors' offices. On April 19, 1977, a warrant was obtained for the building, but the agents discovered when they attempted to execute this warrant that the offices had been moved to another building.

On September 20, 1978, an indictment was returned against appellee charging him with Medicare fraud, conspiracy and mail fraud.[4] On December 28, 1978, the district court, after a lengthy hearing, granted appellee's motion to suppress. This appeal followed.

The general warrant and the unrestricted search that follows have been condemned by Americans since Colonial days.

The Fourth Amendment declares that the right to be secure against unreasonable searches shall not be violated, and it further declares that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." General searches have long been deemed to violate fundamental rights. It is plain that the amendment forbids them.

*Marron v. United States*, 275 U.S. 192, 195, 48 S.Ct. 74, 75, 72 L.Ed. 231 (1927). *See also Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971); *Stanford v. Texas*, 379 U.S. 476, 481, 85 S.Ct. 506, 509, 13 L.Ed.2d 431 (1964); *Boyd v. United States*, 116 U.S. 616, 625–26, 6 S.Ct. 524, 529–530, 29 L.Ed. 746 (1886).

There can be no doubt about the particularity requirements of the fourth amendment.

The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.

*Marron v. United States, supra*, 275 U.S. at 196, 48 S.Ct. at 76.

The warrant at issue fails to meet the requirement of particularity. The officers' discretion was unfettered, there is no limitation as to time and there is no description as to what specific records are to be seized. As a result of this general description, the executing officers seized all of the Medicare and Medicaid records of the three doctors and, in addition, records of non-Medicare-Medicaid patients. It seems clear that the executing officers could not or made no attempt to distinguish bona fide records from fraudulent ones so they seized all of them in order that a detailed examination could be made later. This is exactly the kind of investigatory dragnet that the fourth amendment was designed to prevent.[5]

The government argues that if the warrant is read in a common sense fashion as required by *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), it calls for all of the Medicare and Medicaid records in the doctors' offices. It seeks to support this position by the affidavit information received from three of the informants, which it says "established a large-scale scheme to defraud the Government, a scheme of such proportions that it was reasonable to believe that it could encompass all the doctors' Medicare patients' records and billings." Brief at 16.[6]

---

4. On April 11, 1978, Abrams and London waived indictment and entered guilty pleas to a one count information of Medicare fraud. At the time set for sentencing, Abrams was allowed to withdraw his gulity plea.

5. Our brother in his concurrence observes that warrants are often drafted under conditions of exigency and urges that minor drafting errors should not be a reason for vitiating a warrant. Whatever validity this comment may have, it is clearly not pertinent to the situation in this case. There was a four year investigation here. The warrant was not drafted under conditions of exigency. There was no reason for the magistrate to act in haste. The government should have known exactly what records it wanted and there was ample time to draft a warrant

that would meet the requirements of the fourth amendment and avoid the proscription against generality.

6.                    AFFIDAVIT

I, Paul M. Conrad, Special Agent, Federal Bureau of Investigation, being duly sworn, do hereby depose and say as follows:

On or about April 15, 1977, Brian J. McMenamin, Health Insurance Program Specialist, Bureau of Health Insurance, Department of Health, Education, and Welfare, stationed in Boston, Massachusetts, advised that:

A. Ms. Erica Pascal, a former employee of Abrams, London and Associates, Inc., responsible for preparing medicare forms to be submitted for payment on behalf of Maurice

We observe first that it is the affidavit, not the warrant which is to be read in a common sense fashion under the teaching of *Ventresca*. The use of "common sense" does not eliminate the requirement for specificity in the warrant. Using the rubric "common sense," the government would return us to the general warrant era. If, as the government urges, the affidavit information called for all of the Medicare-Medicaid records in the offices, then the warrant should have said so.[7] The warrant as drawn left it entirely up to the discretion of the officers to determine what records to seize. Since they had no guidance at all, they seized them all. This may have been prudent, but it was also unconstitutional. Even if there were probable cause to seize all of the doctors' Medicare and Medicaid files, the mere fortuity that the officers seized records that could have been within the permissible scope of an adequately drafted warrant cannot rehabilitate this particular warrant. *See In re Lafayette Academy*, 610 F.2d 1 (1st Cir. 1979); 2 W. LaFave, Search and Seizure 101 (1978).

The warrant here suffers from the same constitutional infirmities which we held invalidated the warrant in *Montilla Records of Puerto Rico, Inc. v. Morales*, 575 F.2d 324 (1st Cir. 1978). As in *Montilla Records*, the warrant was amorphously worded so as to

Abrams, M.D., Abraham London, M.D., and Abrams, London and Associates, Inc., in an affidavit to the Department of Health, Education, and Welfare stated that Doctors Abrams and London would add many tests to the billing back of patient's laboratory schedule that were never performed and that Doctors London and Abrams would add additional tests to the medicare forms in order to secure additional payments. Ms. Pascal further stated that the patients' medical records which are separate from the billing records do not list the services falsely billed nor the false diagnoses. Ms. Pascal further stated that the laboratory itself could not have physically performed all of the tests billed. Ms. Pascal also stated that on occasion she was instructed to trace the patient's signature from the record or to sign the patient's name and in parenthesis add "By daughter" or something similar.

B. Ms. Pascal has provided to the Department of Health, Education, and Welfare, Social Security Administration, a number of SSA–1490 forms containing handwritten additions.

C. Mrs. Elizabeth Michaud, formerly employed as a laboratory technician for Doctors London and Abrams, stated to representatives of the Department of Health, Education, and Welfare that tests that were neither performed by the office or BIORAN (an outside laboratory) were added to the bill.

Mrs. Michaud also said that Doctors London and Abrams exaggerated diagnoses to justify the extensive laboratory work.

D. Mrs. Constance L. Coleman, formerly employed as a secretary-receptionist for Doctors London and Abrams, was responsible for, among other things, completing billing forms such as the medicare forms. In an affidavit to the Department of Health, Education, and Welfare, Mrs. Coleman stated that she completed medicare forms using the information recorded on the billing cards which the doctor completed in conjunction with the medical histories. She was instructed to list on the medicare claim form all the services that were listed on these cards. Mrs. Coleman also stated that after the medicare forms were typed she sent the form to the doctors for their signatures and that frequently these forms were returned with lab tests added. She was also told to add the additional tests to the billing cards but as far as she knew the medical records were never changed to reflect these additional tests.

Mrs. Coleman further states that these tests added to the claims forms were not performed according to the medical history and that during her employment there she checked the medical records for laboratory results on a number of beneficiaries and found about 50 incidents where the doctors were billing for laboratory tests that were not performed.

7. We do not believe that the affidavit here would support a search and seizure of all the doctors' Medicare and Medicaid records. In the first place, we are told only that the three informants were former employees; the periods of their employment are nowhere suggested. In the second place, we have no license to assume that all or even nearly all Medicare beneficiaries' claim forms listed tests and services that were never performed. The doctors' former secretary, Coleman, said that she checked records for an unspecified number of Medicare beneficiaries and found "about 50" incidents of inflated billing. If Coleman's tenure was a long one, the extent of her findings diminished the likelihood of pervasive fraud; if her tenure was short, her findings do not cover the entire time span for which records were seized. We add that, were we to hold the search in this case to be justified by the affidavit, we can see no basis for invalidating in a future case a search and seizure of all records of payables and expenditures relying on an affidavit that some unspecified percentages of a business's expenditures exceeded the relevant bills payable.

result in an indiscriminate seizure of relevant and nonrelevant material. And, as in *Montilla Records*, the affidavit contained definite information that could have been used to specify the records to be seized. Two of the informants, Pascal and Coleman, stated that the medical records were separate from the billing records and did not list the services or tests falsely billed. As pointed out by the district court, the warrant could have instructed the officers to seize those files in which the billing record showed a higher total than the medical record. A time frame should also have been incorporated into the warrant. In *United States v. Klein*, 565 F.2d 183 (1st Cir. 1977), we held that a warrant that failed to provide any before the fact guidance to the executing officers was unconstitutionally issued. That is the same situation as we have here.

Since this problem is a continuing one, we make two observations suggested by the facts of this case without assuming to proffer an advisory opinion. In the first place, if an affidavit contains an averment by an employee that fraudulent practices were regularly pursued during his or her employment, and the term of such employment is set forth, the warrant could authorize the seizure of all records of Medicare and Medicaid services billed and purportedly performed during that period. In the second place, if the means of identification required some analysis and matching, e. g., by comparing patients' invoices with records of actual tests performed, this is a sufficient guarantee of particularity. Should the process be deemed too disruptive by the occupant of the premises, he would have the option of agreeing that documents or copies thereof be taken from the premises for the necessary scrutiny. In other words, the person whose premises are to be searched could insist on a search *in situ* rigorously restricted to the directions in the warrant, with the right to consent to means less physically disruptive.

It is true, as the government points out, that courts have approved warrants describing the things to be seized in generic terms but, in most instances, the material to be seized was contraband or stolen property. *See, e. g., Steele v. United States No. 1*, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925), "cases of whiskey"; *United States v. Davis*, 542 F.2d 743, 744 (8th Cir.), *cert. denied*, 429 U.S. 1004, 97 S.Ct. 537, 50 L.Ed.2d 616 (1976), "$5,815.25, part of which is bait money"; *United States v. Scharfman*, 448 F.2d 1352, 1354 (2d Cir. 1971), *cert. denied*, 405 U.S. 987, 92 S.Ct. 944, 30 L.Ed.2d 789 (1972), "fur coats, stoles, jackets and other finished fur products, books, records and other fruits and instrumentalities." We found the generic description sufficient to satisfy the particularity requirement of the fourth amendment where the affidavits established that goods described in generic terms were likely to have been stolen and constituted a dominant part of the goods on the premises. *United States v. Cortellesso*, 601 F.2d 28 (1st Cir. 1979). In *Grimaldi v. United States*, 606 F.2d 332 (1st Cir. 1979), we held that the phrase "other paraphernalia used in the manufacture of counterfeit federal reserve notes" did not render a warrant so general as to invalidate it. We quoted the accepted rule that where the property is of a specified character and that character is contraband, a description in terms of its character is sufficient. *Id.* at 338–339. We pointed out in *Montilla Records of Puerto Rico, Inc. v. Morales, supra*, 575 F.2d at 326:

> These exceptions involved special contexts in which there was substantial evidence to support the belief that the class of contraband was on the premises and in practical terms the goods to be seized could not be precisely described.

Business records, although they may contain evidence of fraud, do not fall into the category of stolen or contraband goods. The government has cited no case and we have found none in which a seizure of all records was held valid pursuant to a generally worded warrant such as we have here. In the cases we have canvassed where a seizure of records was upheld, there has been some limitation in the warrant as to the records to be seized, e. g., *United States v. Scherer*, 523 F.2d 371 (7th Cir. 1975)

(business records relating to the purchase and sale of firearms); *Shaffer v. Wilson*, 523 F.2d 175 (10th Cir. 1975) (fiscal records from January 1, 1966, to December 31, 1970). Although the warrants in *Scherer* and *Shaffer* authorized seizures similar in breadth and purpose to that executed against Doctors Abrams and London, in those cases the warrant specified clearly the scope of the search and seizure and left nothing to the discretion of the executing officers. Such limitation, moreover, must be a meaningful one. In *In re Lafayette Academy*, 610 F.2d 1 (1st Cir. 1979), we held unconstitutional a warrant authorizing the seizure of "most every sort of book or paper at the described premises, limited only by the qualification that the seized item be evidence of violations of 'the laws of the United States, that is 18 U.S.C. sections 286, 287, 371, 1001, and 1014.'" *Id.*, 610 F.2d at 3. *See also Vonder AHE v. Howland*, 508 F.2d 364 (9th Cir. 1975) (warrant authorizing seizure of all business records invalid because of its generality).

In *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), the Court dealt with the interlocking claims of violations of the fourth and fifth amendments relative to the seizure of business records. The information sought concerned fraudulent real estate settlement activities. Between two and three percent of the files from the law offices were seized and less than five percent of the corporate files were taken in a search lasting about four hours. The Court first dealt with the fifth amendment defense and, after an extensive review of the applicable cases, held "that the search of an individual's office for business records, their seizure, and subsequent introduction into evidence do not offend the Fifth Amendment's proscription that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'" *Id.* at 477, 96 S.Ct. at 2747.

It next discussed the question of whether the warrants were so broad as to make them "general." The claim was that, although

the warrants for the most part were models of particularity, Brief for Petitioner 28, he contends that they were rendered fatally "general" by the addition, in each warrant, to the *exhaustive list of particularly described documents*, of the phrase "together with other fruits, instrumentalities and evidence of crime at this [time] unknown" (emphasis added).

*Id.* at 479, 96 S.Ct. at 2748. In discussing this claim, the Court noted:

General warrants, of course, are prohibited by the Fourth Amendment. "[T]he problem [posed by the general warrant] is not that of intrusion *per se*, but of a general, exploratory rummaging in a person's belongings. . . . [The Fourth Amendment addresses the problem] by requiring a 'particular description' of the things to be seized." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 [91 S.Ct. 2022, 2038, 29 L.Ed.2d 564] (1971). This requirement " 'makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant'." *Stanford v. Texas*, 379 U.S. 476, 485 [85 S.Ct. 506, 13 L.Ed.2d 431] (1965), quoting *Marron v. United States*, 275 U.S., at 196.

*Id.* at 480, 96 S.Ct., at 2748.

It then went on to limit the challenged phrase "as authorizing only the search for and seizure of evidence relating to 'the crime of false pretenses with respect to Lot 13T.'" *Id.* at 480, 96 S.Ct. at 2748. The Court noted that the challenged phrase "appears in each warrant at the end of a sentence containing a lengthy list of specified and particular items to be seized, all pertaining to Lot 13T." *Id.* at 480, 96 S.Ct. at 2748. The warrants in *Andresen* specified in great detail the particular items to be seized. *Id.* at 480–81 n.10, 96 S.Ct. at 2748. Here, in contrast, there is no specificity at all, only the general command to seize:

certain business and billing and medical records of patients of Doctors Abrams, London, Braun, and Abrams, London and

Associates, Inc. which show actual medical services performed and fraudulent services claimed to have been performed in a scheme to defraud the United States and to submit false medicare and medicaid claims for payments to the United States or its agents; in violation of Title 18, United States Code, Section 1001[.]

We read *Andresen* to mean that the "general" tail of the search warrant will be construed so as not to defeat the "particularity" of the main body of the warrant. *Andresen* reiterates the Court's continued recognition that general warrants are prohibited by the fourth amendment. The continued vitality of that prohibition is more essential than ever because of the dilution to the point of extinction of the holding of *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), that all government attempts to procure a person's private papers were unconstitutional under both the reasonableness clause of the fourth amendment and the self-incrimination clause of the fifth. In *Warden v. Hayden*, 387 U.S. 294, 304, 87 S.Ct. 1642, 1647, 18 L.Ed.2d 782 (1967), the Court held that the language of the fourth amendment does not support any distinction between " 'mere evidence' and instrumentalities, fruit of crime, or contraband." This holding wounded *Boyd* mortally. The coup de grace was delivered with the removal of business records from the self-incrimination protection of the fifth amendment by *Andresen, Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), and *Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973). The particularity command of the fourth amendment, along with probable cause, is the only protection a citizen now has against a general search of his private papers.

In a case involving the detailed examination of voluminous business records of a person being investigated for possible criminal activity, the usual method for obtaining such records is by subpoena. We note that in this case HEW recommended that the doctors' records be subpoenaed. We realize that the issue of a subpoena always entails the risk that the records will be tampered

with or even destroyed before they are delivered. The government's only alternative to this procedure, however, is strict compliance with the fourth amendment's requirement of a particularized warrant. The Supreme Court has put the issue in proper perspective. "Our society is better able to tolerate the admittedly pornographic business of petitioner than a return to the general warrant era; violations of law must be dealt with within the framework of constitutional guarantees." *Lo-Ji Sales, Inc. v. State of New York*, 442 U.S. 319, 329, 99 S.Ct. 2319, 2326, 60 L.Ed.2d 920 (1979).

*Affirmed.*

LEVIN H. CAMPBELL, Circuit Judge (concurring).

While I find the case very close, I accept the judgment of the district court and of my colleagues that the language in this warrant does not provide a clear enough description to comply with the fourth amendment's requirement that a warrant "particularly describ[e] . . . the things to be seized." A dictionary definition of "particularly" includes the notion of "item by item." Webster's Third New International Dictionary, at 1647 (1971). While the courts have not gone so far as to require a warrant to contain, in effect, a laundry list of seizable items, they have required, in keeping with the very express language of the fourth amendment, that the

"property [to be seized] must be so definitely described that the officer making the search will not seize the wrong property." *People v. Prall*, 314 Ill. 518, 522–23, 145 N.E. 610, 612 (1924), quoted in *United States v. Klein*, 565 F.2d 183, 190 (1st Cir. 1977) (dissenting opinion).

Here the warrant directed seizure of records "which show actual medical services performed and fraudulent services claimed to have been performed in a scheme to defraud the United States and to submit false Medicare and Medicaid claims for payments to the United States or its agents; in violation of Title 18, United States Code,

Section 1001." I reluctantly accept the view that this is too elliptical to give clear guidance to the seizing officer.

The present description, to be sure, avoids the chief infirmity of the warrant in *In re Lafayette Academy*, 610 F.2d 1 (1st Cir. 1979); it directs the executing officers only to papers constituting evidence of a particular, narrowly defined crime, *i. e.*, Medicare-Medicaid fraud, which was the crime forming the basis of the probable cause to issue the warrant. In *Lafayette*, by contrast, the criminal scheme under investigation was not described at all in the warrant. We emphasized in *Lafayette*, however, that it might not be sufficient merely to describe the objects to be seized in terms of their character as evidence of the stated fraud. *Id.*, note 4. Thus we said,

> "In many instances of warrants authorizing the seizure of documents from a general file efforts may also be required to narrow the documents by category, time periods, and the like." *Id.*

The need for particularization gives rise to a dilemma in fraud investigations. The investigators usually do not, and often cannot, know in advance precisely what they will find when they search through files pursuant to a warrant. They, therefore, may find it difficult to describe what they are seeking, other than to say that they expect to find, and will seize, documents constituting evidence of the particular fraud. Such a description leaves it up to the officers executing the warrant to determine, on the spot, what papers constitute relevant evidence of the fraud being investigated, and to seize only those. Yet while such a general description makes sense from the point of view of those investigating crime, and may, indeed, be the very best they can provide in some cases, the constitution requires the warrant to "particularly describe" the things to be seized. Hence the dilemma.

I don't know what the eventual answer to this problem will be. No Supreme Court case fully confronts the question. In *Andresen v. Maryland*, 427 U.S. 463, 478–84, 96 S.Ct. 2737, 2747–2750, 49 L.Ed.2d 627 (1976),

the Supreme Court did accept a warrant description which, after a fairly particularized listing of items, went on to direct the seizure of books, records, etc., "showing or tending to show a fraudulent intent and/or knowledge as elements of the crime of false pretenses." *Id.* And the warrant ended with the challenged catch-all phrase permitting seizure of fruits, instrumentalities and evidence of crime "at this [time] unknown." The foregoing language, however, follows an otherwise quite specific and narrow description. Furthermore, with respect to this language, the *Andresen* Court never discussed the fact that in the course of the search the officers would necessarily have to make some sort of on the spot determination of their own as to just what items constituted relevant evidence of the designated crime, in order to know what to seize. Lower courts such as ourselves, and law enforcement authorities, will have to await future guidance on the question whether a warrant is sufficiently particular if it identifies the documents to be seized solely or largely in terms of their character as evidence of the fraud under investigation. The answer may turn, in part, on whether it is difficult or easy, in a given case, for officers to determine whether certain documents evidence the fraud in question. In some cases, *e. g.*, an anti-trust case, the executing officer would have to exercise a far more refined legal judgment than in others to determine what papers constituted "evidence" and hence were seizable. *Cf. Montilla Records of Puerto Rico, Inc. v. Morales*, 575 F.2d 324 (1st Cir. 1978). Unless the necessary judgment is one the executing officers can be expected to perform reliably, a description identifying seizable items as any that constitute evidence of the particular fraud would seem too general.

A related question is the extent to which a warrant may properly authorize the seizure of files containing a jumble of "innocent" as well as "guilty" materials. In the present case, the file of a Medicare-Medicaid patient obviously contains a good deal more material than that which bears on the padded reimbursement claims of the physician. The latter presumably consists main-

ly of papers showing what actual medical services and procedures were provided, together with copies of the doctor's claim for monetary reimbursement. But the physician may also have retained in the file notes of patient complaints and history, and of his own diagnoses and evaluation. The file could include patient information of a very private nature. *Compare Hawaii Psychiatric Association v. Ariyoshi*, 481 F.Supp. 1028 (D.C.Haw.1979) (enjoining search, pursuant to state administrative warrant, of Medicaid psychiatric patient records). In cases of the present sort, I do not believe that a criminal warrant can properly direct the seizure of each Medicare-Medicaid patient's entire file in a doctor's office, with its mix of relevant and irrelevant materials. As discussed in *Lafayette*, such a warrant might be adequately *particular*, in that it would inform the executing officer precisely what to take (*i. e.*, all files of Medicare-Medicaid patients), but it would violate the probable cause requirement of the fourth amendment, since it would permit the indiscriminate seizure of irrelevant "innocent" materials of a confidential nature along with materials pertinent to the Medicare-Medicaid fraud being investigated.[1]

The law is still largely unformed in this difficult area. The problem is not merely the product of the development of the Xerox machine, the growth of white-collar fraud, and the accompanying explosion of paper; it is more immediately the product of the Supreme Court's decisions in *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), and, more recently, in *Andresen*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627. Prior to these cases government agents could not have searched personal files, *see, e. g., Boyd v. United States*,

116 U.S. 616, 625–26, 6 S.Ct. 524, 529–530, 29 L.Ed. 746 (1886), nor were warrants available for the seizure of "mere evidence" (as distinct from the fruits and instrumentalities) of crime. Thus only recently have investigators been encouraged to try to use warrants interchangeably with subpoenas in fraud cases.[2] *See generally* 90 Harv.L. Rev. 945, "Formalism, Legal Realism, and Constitutionally Protected Privacy under the Fourth and Fifth Amendments." An investigator's understandable and, in some respects, perfectly reasonable desire to use a warrant to get at myriad documents he cannot describe in advance is in tension with the fourth amendment's flat command that a warrant describe the "things to be seized" with particularity.

While we are in no position to resolve this general controversy, there is no escaping the need to decide this case; and, somewhat reluctantly, I accede to my brothers' decision regarding the present warrant. For reasons already expressed, this warrant would clearly exceed the probable cause requirement of the fourth amendment were it construed to authorize the wholesale seizure of all files pertaining to Medicare-Medicaid patients, that actually occurred. While the warrant is, in fact, narrower than that, the operative language informing the officers what to take is overly succinct. They are to seize records "which show actual medical services performed and fraudulent services claimed to have been performed" in the described scheme to defraud. While suggestive of what is to be taken, this formula is scarcely more specific than a direction to take all documents evidencing the particular fraud. The more one studies it, the less certain it seems. What records show "actual" services performed? How

---

1. While such a warrant authorizing seizure of entire files would be improper in a case like this, it might be proper in cases involving a largely or wholly illicit business—such as an illegal drug manufacturing concern. In such cases, even if the files turn out to contain much irrelevant or innocent material, the predominantly illegal character of the enterprise could provide probable cause to seize entire files.

2. The looser standards of relevance applicable to subpoenas are justified, to some extent, by the fact that the party whose papers are being seized or copied can seek judicial narrowing of the subpoena or a protective order *prior to* compliance. While the subject of a warrant can seek the return of papers alleged to have been improperly seized, he is in the position of one attempting to close the barn door after the horses have escaped.

will the investigators know? What records will show "fraudulent services claimed to have been performed"? Must the investigator know the claimed service was not performed to seize the record?

While common sense might provide an answer to many of these questions, I am not satisfied that the general statement measures up to the particularity expressly required by the fourth amendment. At least this is so where the search and seizure is directed at medical files, and not at files of a substantially or wholly illegal enterprise, involving privacy interests of a lesser character. The government, moreover, should have been able to do better. Surely its records reflected the names of the patients for whom Dr. Abrams had obtained Medicare-Medicaid reimbursement and in what amounts. Could it not have named these patients in the warrant, and directed the seizure of evidence of the services performed with respect to those individuals? At very least, the relevant time frames should have been indicated.[3]

I make several concluding comments. First, insofar as much of the court's opinion is based on the failure of the officers to execute the warrant properly, I think it confuses improper execution with the particularity requirement of the fourth amendment. It is clear that overzealous execution requires suppression only of any materials seized outside of the warrant's authority (and the fruits of any such improperly seized material). *See Andresen, supra.* Improper execution may to some degree be evidence that the warrant description was confusing, hence lacking in particularity, but it can just as easily reflect overzealousness or ineptness by the executing officers. In any event, the relevant issue here is the description, not the execution.

Second, I agree the officers should not have seized all Medicare-Medicaid files, but in fairness I don't think the warrant authorized such blanket seizure and removal of files. Thus the court's admonition to conduct the entire search *in situ*, while certainly correct, relates only indirectly to the constitutionality of the warrant. Suppression, moreover, is not the remedy for improperly taking all the files off the premises.

Third, I note my exception to the surprising view implied in the court's opinion that only the affidavit, not the warrant, should be read in a "common sense fashion." While the familiar phrase from *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), was framed in a case dealing with the sufficiency of an affidavit, I cannot believe the court means to indicate that a significantly different standard should apply to the warrant itself. Warrants, like affidavits, are often drafted under conditions of exigency and one cannot realistically demand the niceties required in fields like conveyancing and estate planning. A tendency of courts towards 20–20 hindsight review of descriptive warrant language would place even the most careful investigations and prosecutions under a cloud. Suppression proceedings arise after thousands of dollars and many hours have been spent to investigate and prosecute a crime; suppression is a drastic remedy which may well insulate a wrongdoer from all further prosecution. It should only be invoked where constitutional rights have been clearly violated—never where only minor technical errors, of no real substance, have occurred.

Finally, the time may have come to stop quoting the phrase from *Marron v. United*

---

3. My brothers suggest that "if an affidavit contains an averment by an employee that fraudulent practices were regularly pursued during his or her employment, and the term of such employment is set forth, the warrant could authorize the seizure of all records of Medicare and Medicaid services billed and purportedly performed *during that period.*" (Emphasis added.) I think my brothers are a bit narrow in their view of the relevant time frame. The fact that a former employee indicates that certain fraudulent practices are being regularly followed during the period of his or her employ might, I think, depending on the circumstances, supply probable cause to believe that the fraud continued for a reasonable time in the future. I think the same sort of analysis could also be applied in regards to the seizure of records dating prior to the time of the employee's tenure.

*States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927), "As to what is taken, nothing is left to the discretion of the officer executing the warrant." While this phrase establishes a worthy ideal, the standard is utterly unreal, as commentators recognize. *Compare* W. LaFave, Search and Seizure § 4.6, Vol. II, p. 96 (noting that under a literal reading of that language few warrants would pass muster). Warrant descriptions must, of course, provide firm guidance to the executing officer, but cannot avoid delegating some responsibility to him. The question is whether the delegation is sufficiently confined by the directions given.

The fourth amendment, as the Supreme Court recently observed, imposes "a standard of reasonableness" upon the exercise of discretion by government officials "to safeguard against arbitrary invasions." *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). I am not persuaded that the standard of reasonableness requires making warrants practically unavailable in cases of white-collar fraud. A white-collar wrongdoer has the same incentive as any other to secrete and destroy evidence; the Supreme Court has not adopted the view, implied by the court here, that a subpoena is virtually the only proper method for obtaining voluminous documentary evidence. *Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). *See also Andresen,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627.

Still, I agree with my brethren that the particularity requirement remains a critical mandate of the fourth amendment, and that the relaxed discovery standards associated with subpoenas are not appropriate for a warrant except, conceivably, in narrowly circumscribed classes of cases involving wholly or largely criminal enterprises. Here, while the case is very close, sufficient attention was not paid to providing specific instructions as to the particular categories of documents that alone could be seized.